In re the MARRIAGE OF John Robert WINEGARD and Sally Ann Winegard.

Upon the Petition of Sally Ann WINEGARD, Appellant,

v.

And concerning John Robert WINEGARD, Appellee.

No. 60452.

Supreme Court of Iowa.

April 25, 1979.

Rehearing Denied June 25, 1979.

Stephen L. Schalk, Bettendorf, for appellant.

Edward W. Dailey and David A. Hirsch, of Edward W. Dailey Law Offices, P. C., Burlington, for appellee.

Considered by REES, P. J., and HARRIS, McCORMICK, ALLBEE and LARSON, JJ.

REES, Justice.

This began as an appeal by the petitioner wife, Sally Ann Winegard, and a cross-appeal by the respondent husband, John Robert Winegard, from the economic provisions of a decree of marriage dissolution. Subsequently, by order of this court, Sally was designated appellant for purposes of this appeal for noncompliance with required filing procedures. We modify the award to the petitioner, and as so modified affirm the judgment and decree of the trial court.

This protracted litigation began in February 1973, when Sally Ann Winegard filed her petition for dissolution of a common law marriage which she alleged to exist between her and John Robert Winegard. Af-

ter a hearing in October of 1974, the trial court held that a common law marriage existed. John then twice applied to this court for permission to perfect interlocutory appeals, both of which applications were denied. He also unsuccessfully sought relief in the federal courts. In June, 1975 the trial court granted Sally temporary attorney fees, from which award John appealed to this court. We affirmed such award in September of 1977 in *In re Marriage of Winegard*, 257 N.W.2d 609 (Iowa 1977). The opinion in *Winegard* above cited provides a detailed presentation of the early course of this litigation.

Following extensive discovery by both parties, a final hearing and trial on the question of dissolution and the issues of property rights and alimony was held in December, 1976. The trial court awarded Sally $75,000 as a lump sum allocation of property rights in lieu of any alimony, and ordered John to pay $10,000 toward the petitioner's attorney fees. Sally had sought an allowance of $25,428.59 for her attorney fees. During the proceedings the trial court also entered several protective orders which effectively barred Sally from discovering information contained in certain financial documents which she claimed were necessary to establish the value of the stock owned by John. In her present appeal, Sally contends the trial court erred in issuing such protective orders and alleges the aforementioned awards are inadequate under the circumstances.

In John's appeal from the ruling of the trial court, he contends: (1) the trial court erred in concluding he is estopped from challenging the validity of a Nevada divorce, which he had aided Sally in obtaining, and her resulting capacity to enter into a common law marriage; (2) the court erred in finding a common law marriage existed between John and Sally; and (3) that the court erred in its finding that an antenuptial agreement executed by John and Sally, which purports to deny Sally any alimony or property settlement from John in the event of a dissolution of their marriage, is void as against public policy to the extent that it would bar the award of alimony and limit John's duty to support.

On the basis of the above asserted grounds for appeal, we find the following issues are before us:

(1) Is John estopped or otherwise precluded from challenging the validity of Sally's Nevada divorces and her consequent capacity to enter into a common law marriage?

(2) Does evidence in the record support the conclusion of the trial court that a common law marriage existed between Sally and John?

(3) Are the terms of the antenuptial agreement, barring alimony and a property settlement, fully enforcible against Sally?

(4) Did the trial court err in issuing the protective order regarding the federal income tax returns of the Winegard Corporation of which John is majority stockholder?

(5) Was the award of $75,000 to Sally as a lump sum in lieu of alimony adequate under the circumstances?

(6) Was the award of $10,000 to Sally to apply on the payment of her attorney fees adequate under the circumstances when the itemization for services rendered indicated charges to her of over $25,000?

■ I. John contends that any purported common law marriage between himself and Sally is void ab initio since Sally had at least one spouse living at the time of the common law marriage due to alleged jurisdictional defects in two Nevada divorces obtained by Sally. John neglects to note that the Nevada decrees are entitled to a presumption of validity until shown to be invalid by one who may properly assert such invalidity. *Cooper v. Cooper*, 217 N.W.2d 584, 586 (Iowa 1974). Before reaching the merits of John's contentions in this regard, we must determine whether either of Sally's divorces is subject to collateral attack, and if so, whether John may launch such a collateral attack.

■ As a preliminary matter, we note that the scope of our review of the rulings of the trial court is de novo. *In re*

*Marriage of Vogel*, 271 N.W.2d 709, 713 (Iowa 1978).

Sally's first Nevada divorce, from one Lonnie Anderkin, who appeared by counsel at the proceedings, took place in December 1966. In *Sherrer v. Sherrer*, 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed.2d 1429 (1948), the United States Supreme Court held the Full Faith and Credit Clause of the United States Constitution barred a party from maintaining a collateral attack upon a divorce decree of a sister state where the party had participated in the proceedings of the rendering state, had an opportunity to contest the jurisdiction of the rendering state at that time, and where the decree is not susceptible to collateral attack in the state in which the judgment was entered. The practical effect of this ruling was to provide a substantial degree of uniformity regarding the vulnerability of divorce decrees to collateral attack in the states of the Union by generally requiring the law of the rendering state to permit such an attack. Three years later this rule was extended to non-parties to the initial proceeding, *Johnson v. Muelberger*, 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552 (1951), and specifically to a subsequent spouse of an appearing party, *Cook v. Cook*, 342 U.S. 126, 72 S.Ct. 157, 96 L.Ed. 146 (1951). Nevada has statutorily limited collateral attacks on Nevada divorces by third parties in Nev.Rev.Stat. § 125.185, which provides: "No divorce from the bonds of matrimony heretofore or hereafter granted by a court of competent jurisdiction of the State of Nevada, which divorce is valid and binding upon each of the parties thereto, may be contested or attacked by third persons not parties thereto."

■ Due to the fact that both parties to Sally's first divorce are bound by said decree, Anderkin having appeared by counsel at the proceedings, § 125.185 of the Nevada statutes would bar a Nevada attack by John upon the divorce decree, and operation of the Full Faith and Credit Clause would produce a like effect in this state. To permit collateral attack in Iowa which could not be undertaken in the state where the judgment was rendered would be to deny the unified nature of our federal system as well as being in contravention of traditional notions of res judicata. *See Johnson v. Muelberger*, at 584–585 of 340 U.S., 476 of 71 S.Ct., 556 of 95 L.Ed. Other courts, under like circumstances have reached a similar conclusion regarding Nevada divorces. *Madden v. Cosden*, 271 Md. 118, 314 A.2d 128 (1974); *Gutowsky v. Gutowsky*, 38 Misc.2d 827, 238 N.Y.S.2d 877 (1963).

Sally's second Nevada divorce presents a different question. During the summer of 1969 she obtained a divorce from one Frank Gilvin. He did not appear, either personally or by counsel. Thus, the *Sherrer* decision is inapplicable here, the jurisdictional question being left open for examination by the courts of sister states, at least upon the petition of the party absent at the original hearing, *Williams v. North Carolina* (hereafter noted as *Williams II*), 325 U.S. 226, 230, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945). A question left unanswered by the *Sherrer*, *Muelberger,* and *Williams II* decisions is the capacity of third parties to attack the validity of ex parte divorces. This is the position from which John Winegard attempts to challenge the jurisdiction of the Nevada court which granted the second divorce.

While the *Williams II* opinion makes it clear that the nonappearing party to an ex parte divorce action is not barred from challenging the jurisdiction of the rendering court in a court of a sister state, the status of third parties seeking to attack the validity of an ex parte divorce is much less clear. If we look to the purpose of the Full Faith and Credit Clause, to have judgments of the courts of one state afforded the same force and effect in sister states as they are in the issuing state so as to effect a decree of national uniformity, *Johnson v. Muelberger*, 584–585 of 340 U.S., 476 of 71 S.Ct., 556 of 95 L.Ed., then we would once again look to the law of Nevada regarding the legal capacity of third parties to collaterally attack an ex parte divorce. Section 125.185 of the Nevada Revised Statutes is not dispositive since the divorce decree is not necessarily binding upon each of the parties. An ex-

amination of relevant case law indicates a potential answer. To maintain an attack on a Nevada judgment, a person or entity not a party to the initial action must have had an interest in the proceedings existing at the time of judgment, not an interest arising subsequent thereto. This standard has been applied to Nevada divorces by the courts of a sister state, *Evans v. Asphalt Roads & Materials Co.*, 194 Va. 165, 72 S.E.2d 321 (1952). Thus if we were to apply Nevada law, John would not be permitted to challenge the Gilvin divorce.

■ *Williams II* acknowledges the potentially compelling interest of states other than that issuing the decree in allowing review of the jurisdiction of the rendering court. 325 U.S. 230, 65 S.Ct. 1095, 89 L.Ed. 1582. The ramifications of a divorce may have a profound effect upon the social policy and interests of a sister state. In this matter it is difficult to understand which, if any compelling social policy of the State of Iowa would be furthered by permitting John to assert the invalidity of Sally's divorce from Gilvin. While it is clear that the Full Faith and Credit Clause as interpreted by the United States Supreme Court does not mandate Iowa's acceptance of the Nevada divorce decree, it would appear that Iowa is not precluded from giving the Nevada judgment full faith and credit when to do so would not be against the interest of the state regarding domestic relations. The existence of a marriage by one of the parties subsequent to the challenged divorce has been found to increase the burden on the attacking party due to the relevant interests of the state. *Hobson v. Dempsey Construction Co.*, 232 Iowa 1226, 7 N.W.2d 896 (1943). A state interest analysis, as will be further elaborated on herein, the focal point of the *Williams II* opinion, would tend to favor Sally rather than John in this context.

The result which would be reached in this case by applying the Nevada position regarding collateral attack upon a divorce decree by strangers is not different from that which would be reached under existing Iowa case law. We have been hesitant to allow collateral attack upon a divorce decree by a stranger to it. *Allen v. Lindeman*, 259 Iowa 1384, 148 N.W.2d 610, 616 (1967); *Farr v. Farr*, 190 Iowa 1005, 1007, 181 N.W. 268, 270 (1921). Although there have been instances where this court has considered the merits of a third party challenge to a divorce decree, *Brett v. Brett*, 191 Iowa 262, 182 N.W. 241 (1921), when directly confronted with the issue of third party standing regarding divorces, we have not allowed such an attack. When we have permitted collateral attack upon a Nevada divorce decree, the challenge has been by the nonappearing party to the initial proceeding. *Cooper v. Cooper*, 217 N.W.2d 584 (1974). Thus, application of the Nevada standard regarding third party standing to contest a judgment would not only be consistent with the unitary purpose underlying the Full Faith and Credit Clause, but also with Iowa law.

■ The trial court held John to be estopped from asserting that the Nevada court lacked jurisdiction to enter a divorce decree due to his complicity in Sally's Nevada proceedings.

There is precedent for a form of estoppel in the divorce context. Indicative is *Swift v. Swift*, 239 Iowa 62, 68–69, 29 N.W.2d 535, 539 (1948), where this court held that "a party against whom a void decree of divorce is granted may be barred by laches or estoppel from attacking it." While the present case does not involve a "void" decree, the rationales employed by the court in precluding the attack are relevant here. First, the court stated: "The safety of society demands that one who seeks to overthrow an apparently valid decree of divorce should proceed with utmost promptness upon discovery of facts claimed to show its invalidity," 239 Iowa at 69, 29 N.W.2d at 539. The court in *Swift* then found estoppel "to be based upon the idea that one who has taken a certain position should not thereafter be permitted to change it to the prejudice of one who has relied thereon."

Both considerations are relevant to the matter before us here. John, having knowledge of any potential jurisdictional infirmities in the second Nevada decree

from the time it was rendered due to his financial aid and encouragement to Sally in procuring said decree, waited until he found it in his interest to challenge the Nevada decree, a period of several years. In twice considering a ceremonial marriage to Sally, as evidenced by the antenuptial agreement and its reaffirmation, he took the position that the Nevada decree was valid, a position relied on by Sally. The effectiveness of the laches argument is limited by John's possible lack of standing to make any challenge, but the interest of society in requiring a prompt challenge to any decree and in limiting such an attack to interested parties dictate a denial of John's claim. Likewise, that John has represented a situation to Sally inconsistent with that which he now asserts brings his action within the *Swift* definition of estoppel. Therefore, even if John has standing to challenge Sally's Nevada divorce, the doctrines of laches and estoppel, as set out in *Swift*, preclude his contesting the decree.

While there is authority contrary to the position we would adopt if basing our holding on the aforementioned Nevada law, *see* Comment, 24 U.Chi.L.Rev. 376, 378–379 (1957), application of the equitable doctrines of estoppel and laches to cases such as that at bar have been uniformly endorsed by commentators. *See* Leflar, *American Conflicts of Law*, §§ 226, 460–462 (3rd ed. 1977); Goodrich and Scoles, *Conflict of Laws*, §§ 127, 259–260 (4th ed. 1964); Clark, *Estoppel Against Jurisdictional Attack on Decrees of Divorce*, 70 Yale L.J. 45 (1960); Weiss, *A Flight on the Fantasy of Estoppel in Foreign Divorce*, 50 Col.L.Rev. 409 (1950); Comment, 24 U.Chi.L.Rev. 376 (1957); Note, *The Dilemma of Third Party Attacks Upon Foreign Divorces*, 17 Brooklyn L.Rev. 70 (1950); and by the majority of the courts, *Swift; Gilb v. Gilb*, 170 Cal. App.2d 379, 339 P.2d 176 (1959); for additional citations consult authorities listed above. Therefore, we hold the trial court did not err in finding John estopped from challenging Sally's second divorce. We specifically base our conclusion on considerations of estoppel and laches, as previously applied by this court in *Swift*, and those

Iowa precedents limiting third-party challenges to divorce decrees. In so doing we note the Full Faith and Credit Clause does not provide unqualified protection for the second Nevada decree, although a state interest analysis, as permitted by *Williams II*, would in this instance favor the protection provided by the trial court.

■ John contends the trial court was wrong in concluding he was estopped from attacking the Nevada decree because the fact of estoppel had not been specifically pled by Sally. While preferable, it is not necessary that an estoppel be directly alleged when the operative facts from which the estoppel arises are embraced within the petition. *Dierking v. Bellas Hess Superstore, Inc.*, 258 N.W.2d 312, 314 (Iowa 1977). Such is the case here. Since the issue of validity of the second Nevada divorce is not properly before the court, the presumption of validity accompanying the Nevada judgment and decree leads to the conclusion that Sally possessed the capacity to enter into a common law marriage. We therefore proceed to a consideration of the remaining issues.

■ II. John strenuously controverts the ruling of the trial court that a common law marriage existed between him and Sally. There are three elements requisite to a common law marriage: (1) intent and agreement in praesenti to be married by both parties; (2) continuous cohabitation; and (3) public declaration that the parties are husband and wife. *In re Estate of Fisher*, 176 N.W.2d 801, 805 (Iowa 1970). The burden of proof lies on the party asserting its existence, and such a claim of marriage will be regarded with suspicion, there being no public policy in Iowa favoring common law marriage. *In re Marriage of Reed*, 226 N.W.2d 795, 796 (Iowa 1975). Upon a review of the entire record, we conclude the trial court did not err in finding a common law marriage relationship to exist.

■ In our holding with respect to the trial court's award of temporary attorney fees to Sally we found, on the record at

that stage of the proceedings, that Sally had presented sufficient proof to create a fair presumption of the existence of a common law marriage. We made clear we were not, at that time, finding that a preponderance of the evidence indicated a common law marriage. *In re Marriage of Winegard*, 257 N.W.2d 609, 615 (Iowa 1977). The precise issue now before us has not been previously determined. In addition, more evidence was presented at the trial court level subsequent to our earlier *Winegard* decision. Conclusions relevant to the issue of the existence of a common law marriage were set out in our prior *Winegard* opinion at pages 616–617 of 257 N.W.2d:

> The record discloses the following bearing on the existence of the marital relationship: (1) Sally's intent and belief with respect to her relationship with John; (2) opinions of various witnesses that the community generally regarded the parties as married; (3) continuous cohabitation by the parties since April of 1971; (4) John's failure to deny his alleged marriage; (5) John's acquiescence in Sally's use of his name and her representations to the community they were in fact married; (6) Sally's receipt of a wedding band from John; (7) hotel registrations and travel reservations wherein the parties were listed as Mr. and Mrs. John Winegard; (8) receipt of wedding gifts without objection by John; (9) payment by John of retail charge accounts incurred by Sally as Mrs. John Winegard; (10) mail received and sent by the parties as Mr. and Mrs. John Winegard; (11) John's consent to Sally's ownership of and designation as beneficiary under an insurance policy on his life wherein Sally was referred to as "insured's wife;" (Petitioner's ex. # 22); and (12) checks endorsed by John directing payment to the order of "Sally Winegard." (Petitioner's ex. # 8, # 9).

The above clearly indicate the existence of a common law marriage in accord with the essential elements set out in *Fisher*. While John contends he lacked the requisite intent to enter into a marital relationship, we note that intent may be shown by circumstantial evidence in the common law marriage context, *Winegard* at 617 of 257 N.W.2d, and was shown here. The evidence submitted subsequent to the first appeal to this court, largely regarding Sally having filed a joint income tax return with someone other than John for some of the years in question, was found by the trial court to operate against the conclusion that a common law marriage existed, but not to result in the conclusion that Sally had not met her burden of proof. Our examination of the record taken as a whole leads us to a like determination. Considered alone, the tax information would weigh against the finding of a common law marriage, but the remainder of the record sufficiently overcomes the contrary inferences which might be drawn. Therefore, we conclude that the trial court did not err in its findings and conclusions that a common law marriage existed between John and Sally.

John invites us to abolish common law marriages in Iowa. He cites little authority to support his position, and we are not inclined to accept his invitation in this regard.

III. Three of the remaining issues, all relating to the amount awarded Sally as a lump sum settlement in lieu of alimony, we address together. These, in the order in which they will be addressed, include: (1) the propriety of the protective orders entered by the trial court limiting Sally's access to tax returns of the Winegard Corporation of which John is majority shareholder; (2) the effect to be given the terms of the antenuptial agreement barring the award of a property settlement or alimony to Sally; and (3) the adequacy of the $75,000 lump sum award to Sally in lieu of alimony.

We require full disclosure of the financial conditions of parties to a dissolution proceeding in order for a trial court to make a proper award of alimony or a property settlement. *In re Marriage of Schantz*, 163 N.W.2d 398, 406 (Iowa 1968). While the position urged by Sally, that the

true net worth of John cannot be determined without a valuation of the stock of the Winegard Corporation and that such data should have been subject to discovery, is well taken, *See In re Marriage of Beeh*, 214 N.W.2d 170 (Iowa 1974); *In re Marriage of Cook*, 205 N.W.2d 682 (Iowa 1973), we deem it unnecessary in this case to reverse the trial court as to the protective orders.

John admits the value of the stock in question to have been $5.6 million in 1969. While a precise determination of the value of the stock at the time of the common law marriage is not available, such a valuation need not be made prior to the award of a lump sum in lieu of alimony to Sally. *Rider v. Rider*, 251 Iowa 1388, 1393, 105 N.W.2d 508, 511 (1960). It is likely the value of the Winegard Corporation has increased since 1969 and we are satisfied that the obligation imposed upon John herein will not greatly distort his net worth or impair his financial security.

■ John contends the antenuptial agreement entered into by him and Sally, both as initially signed and later reaffirmed, would bar the award of alimony or a property settlement to Sally. While acknowledging the general presumption in favor of antenuptial agreements, we have held that provisions of antenuptial agreements limiting alimony are void as against public policy. *In re the Marriage of Gudenkauf*, 204 N.W.2d 586, 587–588 (Iowa 1973); *Norris v. Norris*, 174 N.W.2d 368, 369–370 (Iowa 1970). As the lump sum awarded Sally by the trial court was in lieu of alimony, we find the antenuptial agreement did not bar such an award either as made by the district court, or as will be made later in this opinion. Public policy will not allow a party to a marriage contract to avoid his or her resulting obligation of support. *Norris v. Norris*, 174 N.W.2d at 370. The trial court did not err in refusing to enforce the antenuptial agreement provision regarding alimony in the case under consideration here.

■ We therefore turn to the consideration of the adequacy of the award to Sally.

The trial court concluded $75,000 to be an adequate sum in lieu of alimony. In the light of the *Schantz v. Schantz* criteria (at 405 of 163 N.W.2d) and especially John's wealth, the manner or style of living to which Sally became somewhat accustomed as a consequence of his affluence, and Sally's limited future earning potential, we conclude $140,000 to be a just and adequate lump sum award in lieu of alimony. But for the relative brevity of the marriage relationship, a greater award would have certainly been justified. The decree of the trial court is modified, and Sally is awarded the sum of $140,000 as a full and complete lump sum property settlement in lieu of alimony.

■ IV. Sally further appeals from the trial court's award of $10,000 from John for the payment of her attorney fees. She had sought an allowance of $25,428.59. Temporary attorney fees had been allowed earlier in the course of this litigation to Sally's counsel in the amount of $7,500. Considerable discretion is given to the trial court in the matter of setting fees. *See Winegard*, 257 N.W.2d at 618. Our examination of the record leads us to conclude that the award should have been greater. While some of the expense of this case was occasioned by the untimely filing of certain documents and briefs by Sally's counsel, by far the majority of the time involved and costs incurred herein were caused by John's litigious nature which has not only brought the parties to this court once before, but also to the United States District Court and the Eighth Circuit Court of Appeals as well. The prior award of $7,500 for temporary attorney fees is reaffirmed, and Sally is awarded the further amount of $25,000 toward the payment of all attorney fees for services rendered at the district court level and for the prosecution of this appeal.

Needless to say, John's motion that costs and fees be assessed against Sally is hereby overruled.

In conclusion we hold: (1) Sally had capacity to enter into a common law marriage; (2) the trial court did not err in its

finding that a common law marriage existed between John and Sally; (3) an antenuptial agreement cannot preclude the award of alimony; and (4) the awards to Sally by way of lump sum settlement and for her attorney fees are fixed as hereinabove stated. The decree of the trial court is modified in conformity herewith.

The judgment and decree of the trial court is modified in the foregoing respects and this case as so modified is affirmed. Costs are assessed to appellee, John Robert Winegard.

AFFIRMED AS MODIFIED.