# IN THE COURT OF APPEALS OF IOWA

No. 13-0408
Filed June 25, 2014

**IN RE THE MARRIAGE OF DIANE M. DERRYBERRY
AND BOB R. DERRYBERRY**

**Upon the Petition of
DIANE M. DERRYBERRY,**
    Petitioner-Appellee/Cross-Appellant,

**And Concerning
BOB R. DERRYBERRY,**
    Respondent-Appellant/Cross-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Sherman Phipps (common law marriage ruling) and Richard Clogg (dissolution decree), Judges.

An ex-husband appeals the district court's determination he entered into a common law marriage with his ex-wife. **REVERSED.**

Carmen E. Eichmann, Des Moines, for appellant.

Patricia A. Shoff and Espnola F. Cartmill of Belin McCormick, P.C., Des Moines, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

The threshold question in this appeal is whether the parties entered into a common law marriage. The burden rested with petitioner Diane Derryberry to show she and her ex-husband Bob Derryberry agreed and had the present intent to be re-married, publicly declared their intent, and continuously cohabitated. Because she did not satisfy that burden, we reverse the district court's order finding a common law marriage. Because no marriage existed, the dissolution decree is void and its provisions are vacated.

## I.    Background facts and proceedings

Sometimes "[y]ou got to know when to hold 'em, know when to fold 'em, know when to walk away, know when to run."[1] Twice before, Bob and Diane have been ceremonially married and divorced from each other. At the time of the most recent dissolution trial, Bob was seventy years old and Diane was sixty years old.

Bob is a professional gambler. Diane did not work during their marriages. Bob and Diane met in 1974 and shortly thereafter discovered they made quite a pair. Diane moved in with Bob in 1976, and they formally wed on August 23, 1980. From his prior marriage Bob had two children, Melanie and Dawn. Diane had one daughter from a prior marriage. Bob adopted Diane's daughter, Jennifer, in 1984. Their first marriage lasted nine years, ending when Bob started serving eighteen months in prison for going armed with intent. On the advice of Bob's lawyer, they obtained a divorce on February 16, 1989.

---

[1] Kenny Rogers, The Gambler (United Artists) (1978).

Bob was released from prison in 1990 and the parties resumed living together. In 1994, Bob and Diane purchased a home in Norwalk. On July 26, 1995, Bob and Diane got married for the second time, exchanging vows in Lawton, Oklahoma. The Norwalk house was originally purchased in Bob's name only, Diane's name was added to the deed following the second marriage. In 1996, Bob received land in Arkansas from his aunt. On March 4, 1996, Bob deeded that land to Diane and himself.

Bob and Diane separated for the second time in 1998. Diane moved out of the Norwalk home and back in with her parents. The parties' second divorce was finalized on April 19, 1999. In the second divorce, Diane received a $70,000 property settlement, representing her share of the Norwalk home. Neither party was awarded alimony. The decree did not divide the Arkansas property, leaving it in the names of both parties. Diane went to work for Convergent Communications.

In early 2001, Bob and his then-girlfriend were planning a trip to St. Lucia. When his girlfriend was unable to go, Bob invited Diane instead. After that trip, Diane and Bob started to see each other again. Diane began spending significant time at the Norwalk home, but kept personal belongings at her parents' place.

In 2003, Bob was implicated in an illegal gambling and bookmaking ring. State agents raided the Norwalk home on January 9, 2003. Bob pleaded guilty to money laundering and illegal betting in 2004. Bob forfeited $475,000 in cash

and other assets as part of an agreement with the State. The State accused Diane of perjury in connection with the raid, but eventually dismissed the charge.

Shortly thereafter, while playing poker in Kansas City, Bob suffered his first heart attack and Diane slowly began to move back into the Norwalk home. Diane alleges her return in 2003 marked the beginning of the common law marriage. Bob testified she did not move in on a full-time basis until late 2005 when he had a stent implanted in his heart. Bob testified:

> My health was an issue. She was living in her mom's basement; that was an issue. She didn't have a job, and she didn't even have a checking account. So it kind of worked out for both of us that when I was traveling she could be at the house and I didn't have to worry about anybody breaking in.

Bob and Diane separated for a third time in late 2010. On February 15, 2011, Diane filed a petition to dissolve the common law marriage. Following a hearing on temporary matters, Bob was ordered to pay temporary alimony of $1300 per month. On October 19, 2011, the district court granted Bob's motion to bifurcate the issues of common law marriage and dissolution.

On February 8, 23, and 24, 2012, the district court held a trial on the issue of common law marriage. On June 5, 2012, the district court ruled the parties had entered into a common law marriage. The trial for dissolution occurred over four days in late October and early November of 2012. On December 31, 2012, the district court entered its dissolution decree. In the process, it adopted the findings of the common law marriage ruling.

On January 14, 2013, Diane filed a motion to reconsider under Iowa Rule of Civil Procedure 1.904(2). Bob resisted and filed his own rule 1.904 motion on

February 4. The district court denied both motions on February 20, 2013. Bob appeals. Bob argues Diane did not prove by a preponderance of the evidence the elements to establish a common law marriage. He argues the trial court denied his right to a fair trial by admitting irrelevant evidence and hearsay. He also claims the court improperly distributed property divided in a prior decree and erroneously awarded alimony. He also requests appellate attorney fees.

Diane cross-appeals, arguing she is entitled to a greater alimony award, a greater property award, trial attorney fees, and appellate attorney fees.

## II. Standard of Review

We review claims of common law marriage de novo. *In re Marriage of Martin*, 681 N.W.2d 612, 616 (Iowa 2004).

## III. Analysis

Iowa recognizes both ceremonial and common law marriages. Our state's recognition of common law marriage stretches well over a century.[2] *In re Marriage of Martin*, 681 N.W.2d 612, 617 (Iowa 2004); *In re Estate of Fisher*, 176 N.W.2d 801, 804 (Iowa 1970); *Gammelgaard v. Gammelgaard*, 77 N.W.2d 479, 480 (Iowa 1956); *In re Stopp's Estate*, 57 N.W.2d 221, 222 (Iowa 1953); *Blanchard v. Lambert*, 43 Iowa 228, 231 (Iowa 1876). The burden of proof lies with the party asserting the existence of a common law marriage. *In re Marriage of Winegard*, 278 N.W.2d 505, 510 (Iowa 1979) (hereinafter *Winegard II*). We

---

[2] Iowa is one of only nine states which still recognize common law marriages, the others being Alabama, Colorado, Kansas, Rhode Island, South Carolina, Montana, Oklahoma, and Texas. Common-Law Marriage, National Conference of State Legislatures http://www.ncsl.org/research/human-services/marriage-issues-family-law.aspx#clmar (last visited May 20, 2014).

regard that assertion with suspicion because Iowa has not adopted a public policy favoring common law marriage. *Id.*

The district court found the existence of a common law marriage because "[a]fter 2003 Bob and Diane returned to their usual married routine—Diane staying home, gardening, canning, et cetera; Bob gambling and bookmaking for a living." The fact that the parties fell into familiar roles does not dictate the resolution of the question. Our supreme court has not recognized a public policy that favors a common law marriage when parties resume living together following a divorce. *See Martin*, 681 N.W.2d at 617 n.1. Like most states, in determining whether the facts show a common law remarriage between divorced spouses, we apply the same test as used in deciding whether persons having no previous matrimonial history entered into a common law marriage.[3]

To establish she and Bob entered into a common law marriage, Diane had the burden to prove by a preponderance of evidence these three elements: (1) a present intent and agreement by both parties to be married, (2) continuous cohabitation, and (3) public declaration they were husband and wife. *See Winegard II*, 278 N.W.2d at 510; *see also* Iowa Admin. Code r. 701-73.25(425) (2013). A failure to prove any of the three elements dooms the claim to a common law marriage. *Winegard II*, 278 N.W.2d at 510.

---

[3] *See* Common-law marriage between parties previously divorced, 82 A.L.R.2d 688 (originally published in 1961). *But compare In re Wagner Estate*, 159 A.2d 495, 533 (Pa. 1960) (finding state law more tolerant of common law relationship after divorce) *with Goodman v. McMillan*, 61 So.2d 55, 60 (Ala. 1952) (indicating prior ceremonial marriage weighed against finding of common-law remarriage).

## A.  Present Intent and Agreement

"The requirement of a present intent and agreement to be married reflects the contractual nature of marriage." *Martin*, 681 N.W.2d at 617. Either an express or an implied agreement may support the finding of a common law marriage. *Id.* In fact, a person may be entitled to marital rights if he or she intends to be married, even if the other would-be spouse does not share that intent—provided the conduct of the person not sharing the intent justifies the first person's belief both of them intended to be married and they are cohabiting. *In re Marriage of Gebhardt*, 426 N.W.2d 651, 653 (Iowa Ct. App. 1988); *see McFarland v. McFarland*, 2 N.W. 269, 273–74 (Iowa 1879).

In this case, the district court concluded: "There is no doubt Diane considered she and Bob to have returned to their previous status as husband and wife and that Bob was aware of this and did nothing to dispel or counter that belief on Diane's part or on the part of the public."

In our de novo review, we see the facts differently. The record reveals no clear intention by the parties to be married for a third time. Some of their conduct suggested a present intent and agreement to be married, while other actions pointed toward a reunion of mutual expediency that did not rise to the level of a formal marriage. Bob testified he and Diane never discussed re-entering a marriage relationship. He also testified at one point "towards the end" he expressly told her he never intended to get married again. Bob testified his last will and testament was dated November 1998, and acknowledged he was then in the process of divorcing Diane and did not intend to bequeath her anything. He

recalled that in 2006 or 2007 Diane asked him if he had a will and he told her she would not be receiving anything. Diane did not rebut any of that testimony.

Diane maintains she demonstrated her intent to be married again by returning her wedding ring to her left hand. Bob testified he never saw her with her wedding ring on, but that she always wore her diamond engagement ring, "she had it on all the time." He also testified he had not worn his wedding ring since 1998.

We will discuss the parties' economic arrangements and taxes in greater detail when addressing the public-declaration element below, but we generally note they maintained joint accounts when it saved them money or was otherwise mutually beneficial, but they also conducted certain financial dealings independently of one another.

The instant facts are similar to the situation considered in *Martin*. In that case, the supreme court reasoned: "The fluctuating status of their relationship was, from the beginning, largely based on personal convenience or benefit, which is inconsistent with the concept of marriage." *See Martin*, 681 N.W.2d at 618. We find the inconsistent signals regarding their intent to be married weighs against finding Bob and Diane entered into a common law marriage. Diane has not established a "meeting of the minds" regarding a marital contract.

In addition, Diane cites instances after 2003 when Bob's daughter introduced Diane as her stepmother and instructed her children to call Diane grandma. Diane also points to the obituary for Bob's mother, which identified Diane as a daughter-in-law. We do not find these relational references to be

convincing evidence of the parties' intent to be remarried. The situation is clouded by the fact Diane and Bob have been married twice before; members of their families developed identifiers for them that they would continue to be used whether Diane and Bob were married again or not.

### B.      Cohabitation

While continuous cohabitation is considered an element of common law marriage, the partners are not required to live together for any particular length of time. *See Martin*, 681 N.W.2d at 617. It is circumstantial evidence a common law marriage exists, but it cannot establish a common law marriage standing alone. *Conklin by Johnson-Conklin v. MacMillan Oil Co.*, 557 N.W.2d 102, 105 (Iowa Ct. App. 1996). Cohabitation needs to be tied to the present intent and agreement to be married. *See In re Estate of Wittick*, 145 N.W. 913, 916-17 (Iowa 1914).

Cohabitation often includes the concept of intimacy or sexual relations. *See In re Marriage of Gibson*, 320 N.W.2d 822, 823–24 (Iowa 1982); *see also State v. Kellogg*, 542 N.W.2d 514, 518 (Iowa 1996) (defining cohabitation under Iowa Code section 236.2 as including, but not requiring, the element of sexual relations between parties sharing the same living quarters). Cohabitation is generally defined as "the fact or state of living together, esp. as partners in life usually with the suggestion of sexual relations." *Black's Law Dictionary* 296 (9th ed. 2009).

Diane offered varying dates as to when the cohabitation supporting their common law marriage commenced. She claimed she started gradually moving

into the Norwalk home in 2003, and also said they did not live together until after Bob's conviction in 2004. Bob testified they started living together full time in late 2005 so that Diane could help him in case of a medical emergency.

On appeal, Bob argues he and Diane did not "cohabitate"—in common law marriage terms—because they did not engage in sexual relations. Bob testified for the five years she lived in the house, Diane slept in the master bedroom and he slept on the sofa in the living room. He testified it was more of a friendship than a romance. Bob's daughter Melanie confirmed: "They behaved as friends. They slept—They did not sleep in the same bed. They essentially cohabitated in the same house." Diane testified they did occasionally have sex, but acknowledged Bob slept on the couch.

Diane was able to show she and Bob lived together in the Norwalk house from late 2005 until she moved out in November 2010. But their living arrangement did not definitively prove their present intent and agreement to be married. While we do not hold sexual relations to be an indispensible element of cohabitation, at the same time, the parties' treatment of one another as housemates rather than intimate partners did not support the finding of a common law marriage.

### C.    Public Declaration of Marriage

Finally, we analyze Diane's proof of the third element—public declaration. Common law marriages cannot be secret. *See In re Marriage of Winegard*, 257 N.W.2d 609, 616 (Iowa 1977) (hereinafter *Winegard I*). The parties must engage in a public declaration or "holding out" of their union to others. *Id.*; *Martin*, 681

N.W.2d at 618. Our supreme court considers this element to be the "acid test" of a common law marriage. *Martin*, 681 N.W.2d at 618.

Not all of the parties' declarations must be completely consistent with marriage, because every marital relationship is different. *See generally Fisher*, 176 N.W.2d at 804; *In re Estate of Stodola*, 519 N.W.2d 97, 100 (Iowa Ct. App. 1994). A substantial holding out to the public is sufficient. *See Winegard I*, 257 N.W.2d at 616; *Conklin*, 557 N.W.2d at 105. Parties often can provide documentation of "holding out" through joint tax returns, joint checking account statements, or insurance policies naming the common law spouse as such.

Diane contends the district court was correct in finding she and Bob held themselves out to the public as married between 2003 and 2010. She points out they shared a checking account, a cell phone plan, and car insurance.[4] She also testified she told her doctor, her insurance agent, and a neighbor that she was married to Bob. She also highlights evidence they represented themselves to be married when trying to obtain a refund on a time-share property in Branson, Missouri.[5] Diane's mother, step-father, and sister testified they believed Diane and Bob were married. But Diane acknowledged neither she nor Bob told family members they were common law married.

Bob argues they did not substantially hold themselves out as married after 2003. His family members and friends testified he never intended to remarry Diane. Bob's long-time poker-playing friend, Bret Sampson, testified Bob never

---

[4] The record shows Bob and Diane signed up for joint insurance because they received a two-car discount.
[5] Bob testified to get his refund, he had no choice but to sign the release agreement drafted by Diane's nephew, which indicated they were husband and wife.

mentioned being married to Diane for a third time and never referred to Diane as his wife after the second divorce.

Bob points to inconsistent public acts and declarations on Diane's part. In 2009 she filled out a health insurance form indicating she was legally married, instead of marking the common law marriage box which required a notarized affidavit. Diane had credit cards in her own name and the billing statements were mailed to her mother's address. Diane also bought a car in 2009 without using Bob's credit. In early 2011, before filing for dissolution, she listed herself as single on an application for group life insurance. When she filed for dissolution, she did not know Bob's Social Security number.

For his part, Bob filled out three different health benefit renewal forms during the period in question. On all three forms, he said he was divorced. On the 2009 form, he indicated Diane as next of kin, and signified her relationship to him as ex-wife. Bob also signed listing agreements and seller disclosure reports on three occasions in his effort to sell the Norwalk house. Diane was not listed as a spouse or seller on any of those documents, though she was aware of the house listings.

From 1999 through 2007, Bob filed both federal and state income taxes as a single person.[6] Diane testified she did not see these returns and did not know what tax status he was claiming. By contrast, in 1995 through 1997 when they were married, Bob prepared his tax returns as married filing jointly. He recalled that Diane signed those jointly filed forms because her name was on them. In

---

[6] On the advice of his accountant, Bob did not file tax returns in 2008 through 2010. His accountant's affidavit certified Bob was a single person.

1998, when Bob and Diane were still in their second marriage, Bob indicated he was married, and Diane would be filing separately. Diane filed her taxes as married filing separately in 1998, and as single in 1999, 2000, 2001, and 2011. She did not tax returns from 2002 to 2010.

When parties do not file their tax returns as married persons, that conduct tips the scales away from a public declaration. *See Winegard II*, 278 N.W.2d at 511 (noting "[c]onsidered alone, the tax information would weigh against the finding of a common-law marriage, but the remainder of the record sufficiently overcomes the contrary inferences which might be drawn"); *but see In re Marriage of Gebhardt*, 426 N.W.2d 651, 653 (Iowa Ct. App. 1988) (finding tax returns filed to facilitate an early retirement program do not defeat a claim of common law marriage).

We find it significant that in public declarations such as house listings and income tax returns, Bob made it clear he was a single person. Diane's assertion she did not see his tax returns from 1999 through 2007 does not counteract his declarations. If Bob had been filing as a married person after 2003, she would have been asked to sign the forms as she had during their marriage. In this case, Diane's proof of holding out is not sufficient to overcome the weight of Bob's tax returns and house listings. We conclude the parties did not substantially hold themselves out as married, beyond their pre-existing relationship as former spouses. Unlike the parties in *Gebhardt*, 426 N.W.2d at 653, who were not sophisticated in regard to official documents, the Derryberrys

had been married and divorced twice before and understood the difference between married and single status.

When we view all of the evidence de novo, we determine Diane did not carry her burden to prove by a preponderance of the evidence she and Bob entered into a common law marriage when she moved back into his house. Their living arrangement was one of mutual convenience, not a relationship consistent with the general reputation and intent to be remarried. *See Martin*, 681 N.W.2d at 618.

### D.        Proposed Modifications and Attorney Fees

Iowa courts may divide property and order spousal support under laws relating to the dissolution of a marriage only in the event a marriage is dissolved. *See In re Marriage of Reed*, 226 N.W.2d 795, 796-97 (Iowa 1975). Iowa courts do not have broad equitable powers to divide property between unmarried people based on cohabitation alone. *Martin*, 681 N.W.2d at 619. Because Bob and Diane were not married, the divorce decree entered on December 31, 2012 is void. Bob's obligation to pay spousal support is terminated. We need not consider the parties' other proposed modifications to the decree.

The *Martin* court held attorney fees incurred to prosecute or defend an action to establish and dissolve a common law marriage were allowable under Iowa Code section 598.11 (2011), as long as there was a fair presumption of the existence of a common law marriage, even if the court finds no such marriage existed. *Id.* at 619–20. Regardless of whether attorney fees would be available

to the parties in this case, we decline to award them.  Each party shall pay his or her own fees and court costs shall be divided equally.

**REVERSED.**