# IN THE COURT OF APPEALS OF IOWA

No. 17-0664
Filed May 16, 2018

**IN RE THE MARRIAGE OF LINDA WOLFS**
**AND DAVID WOLFS**

**Upon the Petition of**
**LINDA WOLFS,**
        Petitioner-Appellee,

**And Concerning**
**DAVID WOLFS,**
        Respondent-Appellant.

_____

Appeal from the Iowa District Court for Winneshiek County, Margaret L. Lingreen, Judge.

A former husband appeals the denial of his petition to modify the alimony award in his dissolution decree, alleging a substantial change in circumstances and contending his former wife has entered a common law marriage. **AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED.**

Kevin E. Schoeberl of Story Schoeberl & Seebach, LLP, Cresco, for appellant.

Mark B. Anderson, Cresco, for appellee.

Heard by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**TABOR, Judge.**

Seeking to eliminate or reduce his spousal support obligation, David Wolfs contends circumstances have changed since the entry of the decree dissolving his long-time marriage to Linda Wolfs. First, he alleges Linda remarried by common law. Second, he claims his own health and earning capacity have worsened while Linda's health and financial prospects have improved. David appeals the district court's denial of his request for modification and its conclusion Linda did not enter a common law marriage.

Because the record shows Linda did not have the intent to remarry nor did she declare publicly she had remarried, David cannot prove a new marriage under common law. We affirm the district court on that basis. But because Linda has been continuously cohabitating with her new paramour and receives considerable financial assistance from him, we find a substantial change in circumstances and modify the district court's decision by reducing David's alimony payments.

## I.     Facts and Prior Proceedings

Even now, in his late sixties, David's military service in Vietnam comes back to haunt him. His war wounds left him with posttraumatic stress disorder (PTSD) and cardiovascular maladies linked to Agent Orange. After leaving the Army, he married Linda in April 1974. Just shy of thirty-seven years later, and after raising six children, they divorced in February 2011. At the time of the divorce, Linda was fifty-seven years old and not in good health; David was sixty-one years old. The

divorce decree directed David to pay $750 per month in "traditional" spousal support[1] until Linda died or remarried.

In May 2012, Linda moved in with Christopher Hick, and they have lived together continuously since then. Christopher bought the house where they live and deeded an interest in the property to Linda in joint tenancy with full rights of survivorship. In October 2012, Linda and Christopher invited family and friends to a ceremony they described as a "celebration of love." Linda's grown sons walked her down the aisle, and her granddaughter was the flower girl. While they did not have an officiant, Linda and Christopher did exchange vows and rings. The event was also announced in the local newspaper and on Facebook.

In July 2016, David filed a petition for modification, alleging "a substantial and material change in circumstances to either modify or terminate the spousal support previously ordered." The petition contended Linda had entered a common law marriage. The petition also alleged David's health and financial circumstances had declined since entry of the decree. The district court denied the modification petition. The court found David did not prove the existence of a common law marriage between Linda and Christopher and did not show any other "substantial change in circumstances warranting modification of [David's] spousal support obligation owing to [Linda]." David appeals those findings.

---

[1] In 1980, our legislature replaced the term "alimony" with the phrase "spousal support" in the Iowa Code. But we still use the terms interchangeably in our case law. *See In re Marriage of Ales,* 592 N.W.2d 698, 702 n.2 (Iowa Ct. App.1999).

## II.     Scope and Standards of Review

Petitions to modify the spousal support provisions of a divorce decree lie in equity. *See In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). So our review is de novo. *Id.*; *see* Iowa R. App. P. 6.907. We likewise review claims of a common law marriage de novo. *In re Marriage of Martin*, 681 N.W.2d 612, 616 (Iowa 2004). "To overturn a trial court's decision on attorney fees the complaining party must show" an abuse of discretion. *In re Marriage of Roerig*, 503 N.W.2d 620, 622 (Iowa Ct. App. 1993) (citation omitted).

## III.     Legal Analysis

David attacks the alimony provision of the divorce decree in two ways. He first seeks to end the obligation by proving Linda's relationship with Christopher amounts to a common law marriage. Short of that, he urges elimination or reduction of the support payments based on a material change in circumstances— namely his declining health and earning capacity compared to Linda's renewed vigor, increased work hours, and pooling of resources with her paramour Christopher. We will address each claim in turn.

## A.     Did Linda Enter a Common Law Marriage?

Under the decree, David's obligation to pay alimony ends if Linda remarries.[2] David insists the October 2012 ceremony—dubbed a "celebration of love" by Linda and Christopher—ushered in their common law marriage and

---

[2] Our court has found it is "inappropriate to use cohabitation as an event to automatically terminate alimony in an original dissolution decree." *In re Marriage of Wendell*, 581 N.W.2d 197, 200 (Iowa Ct. App. 1998).

should serve to cut off Linda's spousal support. Linda counters that no contract of marriage exists between her and Christopher either by statute or common law.

Iowa recognizes two forms of marriage: one is ceremonial, governed by Iowa Code chapter 595 (2016), and the other, less formal variety, is known as common law marriage. *See Martin*, 681 N.W.2d at 616–17. "Although a common law marriage is as valid as a ceremonial marriage, there is no public policy favoring this type of marriage." *Id.* at 617 (citing *In re Marriage of Winegard*, 278 N.W.2d 505, 510 (Iowa 1979)). The burden of proving a common law marriage rests with the party asserting its existence, and we carefully scrutinize such claims. *Id.* Proof requires three elements: (1) a present intent and agreement to be married by both parties reflecting the contractual nature of the arrangement; (2) continuous cohabitation; and (3) public declaration that the parties are married. *See Winegard*, 278 N.W.2d at 510. Failure to prove any of the three elements dooms a common law marriage claim. *See Id.* Public declaration has been called the "acid test" of a common law marriage. *Martin*, 681 N.W.2d at 618.

Here, the second element is not in dispute—Linda and Christopher continuously cohabitated since May 2012. But Linda disputes the first and third elements, claiming she and Christopher did not have the intent to be married and did not hold out their relationship as a marriage.

To prove the first element, a present intent to be married, David focuses on the commitment ceremony held by Linda and Christopher in October 2012. Linda acknowledged at the modification hearing that the ceremony had "lots of similarities" to a wedding: mailed invitations, an announcement in the local newspaper, walking down the aisle with family members, a best man, a maid of

honor, a flower girl, vows, religious influences, rings, cake cutting, photography, gifts and cards. Linda's son, Josh, believed the reason for the ceremony was so his mother and Christopher could "just kind of get married." But Linda testified she and Christopher were careful not to utter the words "marriage" or "husband and wife" during the service. She testified: "We're nothing but friends"—though she did acknowledge they had a sexual relationship. Linda's daughter-in-law, Allison, testified Linda told her that they wanted to have a ceremony, but could not have a "true wedding" without Linda losing her alimony. Linda described wanting to be "married in heart, but not on paper."[3]

The role of the ceremony in this case is interesting. Normally, the question is whether a common law marriage exists in the absence of a ceremony. *See In re Fisher's Estate*, 176 N.W.2d 801, 806 (Iowa 1970) (holding "no particular form or ceremony is necessary" to show the entry of a common law marriage contract). Here, the question is whether the occurrence of a public wedding-like ceremony in which a man and woman "dedicate themselves to one another" demonstrates the couple's intent to be married, even though they eschewed the key terms of art. The district court held neither Linda nor Christopher had a present intent to be married. We reach the same conclusion. The stated purpose of the ceremony was to celebrate the loving relationship between Linda and Christopher, but it was expressly not to solemnize a marriage as set out in chapter 595.

On the third element, public declaration, David pointed to evidence Christopher had once introduced Linda as his wife to third parties in front of her

---

[3] David offered into evidence Linda's Facebook post from October 2015 congratulating Christopher on their third anniversary.

son Josh. But Christopher testified he never represented himself to be Linda's husband and people in the Decorah community did not recognize them as husband and wife. Their pastor agreed Linda and Christopher did not present themselves as husband or wife, rather using the term "significant other." A local banker said she had never heard anyone in the community refer to Christopher and Linda as husband and wife.

The district court "found both Linda and Christopher credible in their testimony." The court ruled: "Christopher and Linda have not represented themselves to be married. This was confirmed by various members of the Decorah community, including the couple's pastor, banker, and neighbor."[4] We give weight to the district court's credibility findings. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Otherwise viewing the record de novo, we cannot conclude David established the public-declaration element of common law marriage. Accordingly, we do not find his alimony obligation automatically expired under the remarriage term of the decree.

But this finding does not end our inquiry. The question remains whether Linda's live-in relationship and sharing of expenses with Christopher constituted a substantial change in circumstances justifying an order terminating or reducing David's alimony payments. *See In re Marriage of Ales*, 592 N.W.2d 698, 703 (Iowa Ct. App. 1999) (holding cohabitation may be "so economically akin to remarriage" as to be a substantial change of circumstances justifying the reduction or

---

[4] We find an additional circumstance significant—since the divorce Linda has continued to file her tax returns as a single person. *See Winegard*, 278 N.W.2d at 511 (giving weight to tax filing information in determining common law marriage question).

termination of spousal support). We will address this question in the following section.

### B. Did David Prove a Material and Substantial Change in Circumstances Since Entry of the Decree Warranting a Reduction in or Elimination of His Alimony Obligation?

The spousal support provisions in a divorce decree "are normally final as to the circumstances existing at the time." *In re Marriage of Sisson*, 843 N.W.2d 866, 870 (Iowa 2014) (citing *Mears v. Mears*, 213 N.W.2d 511, 515 (Iowa 1973)). But courts may modify support orders when there is a substantial change in circumstances. Iowa Code § 598.21C(1). To determine where there is a substantial change in circumstances, courts will consider all relevant factors, including changes in employment, earning capacity, income, or other resources of a party; changes in medical expenses of a party; changes to physical, mental or emotional health of a party; change in the residence of a party; remarriage of a party; and possible support of a party by another person. *Id.* § 598.21C(1)(a)–(*l*); *see Sisson*, 843 N.W.2d at 870. "[T]he changed circumstances must be material and substantial, essentially permanent, and not within the contemplation of the court at the time of the [original] decree. *Sisson,* 843 N.W.2d at 870–71 (citing *Mears*, 213 N.W.2d at 515).

As an anchor to our assessment of the change in circumstances alleged by David, we revisit the parties' health and financial conditions when the decree was entered. At the time of the divorce, David experienced joint pain and PTSD related to his military service. As of February 2011, David received $1454 per month in disability payments from the Social Security Administration and another $974 per month from the Veteran's Administration (VA). His VA disability rating was forty

percent. For her part, Linda suffered from arthritis, fibromyalgia, chronic headaches, neck and back pain, skin cancer, a torn rotator cuff, and depression. She had a weight-lifting restriction that limited her employment opportunities. She closed her ceramic business in October 2010. As of February 2011, Linda worked twenty-five hours per week at JCPenney's earning $7.75 per hour or about $931 per month. She received financial assistance from a local charity and was on a waiting list for low-income housing.

Fast forward to the time of David's modification petition in July 2016. David emphasized his declining health. Doctors diagnosed him with herbicide poisoning from exposure to Agent Orange during his military service, a diagnosis that had not been confirmed at the time of the divorce. In light of that diagnosis, the VA raised his disability rating to ninety percent. David had open heart surgery in 2015. He also testified to emerging medical issues with his liver and lungs. At the time of the modification, David was receiving $2906 from the VA and $1581 from the Social Security Administration. He also had received a lump sum payment of $102,843 in back benefits from the VA in May 2015 and a second payment of $2906 in December 2016. With these funds David paid off $12,000 he owed on the contract for his house, built a garage for $23,000, purchased a pickup truck for $37,000, and set up a burial account of $8000. David also acknowledged his medical and dental expenses are completely covered by the VA.

As for Linda, after the divorce, Linda continued to work at JCPenney's until she quit in April 2016. She also filed for bankruptcy and received a discharge. She later took out a $10,000 revolving loan to restart her ceramic business and gift shop, Heavenly Made LLC, and now operates that enterprise full time with the help

of her paramour Christopher. Linda estimated they each worked forty-five to fifty hours per week. She testified she paid $1100 per month in rent for the business, which was not yet profitable.[5] At the time of the modification hearing, Linda received $595 per month in Social Security payments, in addition to the $750 per month in alimony. David argues Linda's health has improved since entry of the decree, asserting "clearly she has the stamina and physical prowess to work 50 hours per week."

We also take into account Christopher's contributions to Linda's support. Christopher received about $3300 per month in disability and retirement benefits from the State of Wisconsin. He paid their shared household bills and the mortgage. Christopher co-signed a vehicle loan with Linda. He also was involved with Linda's ceramics business and was authorized to write checks from her business account. He used his personal credit card to make purchases for the business, for which he received no reimbursement. In 2015, he bought a cargo trailer for Linda to use in the business. Christopher has also named Linda as the beneficiary of his life insurance policy.

The district court acknowledged David's health was declining, but concluded his financial situation had "substantially improved" since entry of the divorce decree. The court calculated that the $750 monthly alimony payment was twenty-nine percent of his income in 2011, but only seventeen percent of his current income. The court noted after satisfying his monthly expenses, David still had $3000 available for discretionary spending. The court stated: "In contrast,

---

[5] Her tax returns showed gross receipts for the business of $13,904 in 2015 and $22,857 in 2016, with gross income from the business of $15,304 in 2015 and $13,688 in 2016.

Linda currently has less monthly income than she did at the time of entry of the dissolution decree." The court further found Linda's health was neither better nor worse than six years earlier. The court ultimately concluded "there has not been a substantial change in circumstances warranting modification of [David's] spousal support obligation owing to [Linda]."

We disagree with the district court's bottom line. While Linda's monthly income may not have increased since the time of the decree, the district court did not fully consider the substantial assistance she is now receiving from Christopher by virtue of their stable cohabitation. At the time of the decree, Linda was seeking charitable assistance and public housing. Now Christopher pays the couple's mortgage and household expenses, freeing Linda to use her own income for discretionary spending and to grow her new business. And Christopher helps with the business efforts and expenditures. Linda also has some peace of mind from her deeded interest in their home and as a beneficiary of Christopher's life insurance. By all measures, Linda's economic prospects have improved considerably since the time of the decree. On David's side of the ledger, we agree with the district court that the increase in his disability benefits has placed him in a more stable financial situation. But those resources are likely to be devoted largely to addressing his everyday needs related to his declining physical condition.

Under the tenet adopted in *Ales*, David was required to show Linda's cohabitation was a substantial change of circumstances. *See* 592 N.W.2d at 703. Since David has met that initial showing, the burden shifts to Linda to convince us that spousal support should continue "in spite of the cohabitation because of an

ongoing need, or because the original purpose for the support award makes it unmodifiable." *See id.*

The purpose of the traditional alimony award in this case was to care for "a dependent spouse who was incapable of self support." The original decree stated: "Considering the length of the parties' marriage, [Linda's] physical and emotional health, her limited earning capacity and the fact she is not likely to become self-supporting, the Court finds an award of traditional alimony is warranted." Linda has not established that the spousal support should continue at the same rate in spite of her cohabitation with Christopher and the improved financial footing that relationship has provided her. The instant case is far different from the situation in *Ales* where the recipient of spousal support received only "sporadic contributions" to the household from her live-in companion. *See id.* By contrast, Christopher was a major contributor to the financial well-being of their household, as well as Linda's business.

Because the aim of enabling Linda to support herself has been partially achieved, we find it equitable to reduce David's alimony obligation. When pressed at oral argument to specify an equitable amount of spousal support at this point in time, David's attorney suggested half the monthly payment of $750 ordered in the original decree. Accordingly, we modify the decree to require David pay Linda $375 per month. We consider it more equitable to reduce than to eliminate the support obligation because David currently has the financial means to pay that amount and Linda is still struggling to derive a profit from her ceramics business.

**C.      Is an Award of Trial or Appellate Attorney Fees Appropriate?**

David challenges the district court's award of $2750 in trial attorney fees to Linda.  Both David and Linda ask for appellate attorney fees.

In modification proceedings, the district court "may award attorney fees to the prevailing party" in a reasonable amount.  Iowa Code § 598.36.  That language is permissive and gives the district court "considerable discretion" in determining whether to award fees.  *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013).  "We have similar discretion in awarding appellate attorney fees."  *See id.* We first look to the parties' respective abilities to pay.  *Id.*  We next consider whether a party resisting the modification petition was successful and whether a party has been obliged to defend the district court's decision on appeal.  *Id.*

After considering these factors and given our modification of the district court's decree in David's favor, we reduce Linda's award of trial attorney fees to $1500.  We decline to award David appellate attorney fees.  Costs of this appeal are divided equally between David and Linda.

**AFFIRMED IN PART, REVERSED IN PART, AND MODIFIED.**