## IN THE COURT OF APPEALS OF IOWA

No. 21-0217
Filed May 11, 2022

IN RE THE MARRIAGE OF MELISSA K. KATS
AND SHADRON D. KATS

Upon the Petition of
**MELISSA K. KATS,**
    Petitioner-Appellee,

**And Concerning**
**SHADRON D. KATS,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Sioux County, Jeffrey A. Neary,
Judge.

Shadron Kats appeals the economic provisions of the decree dissolving his
marriage to Melissa Kats and a post-decree order for temporary spousal support.
**DECREE AFFIRMED; INTERIM SUPPORT ORDER VACATED.**

Timothy J. Kramer of Kramer Law, P.C., Sioux Center, for appellant.

Elizabeth A. Rosenbaum of Rosenbaum Law Firm, P.C., Sioux City, for
appellee.

Heard by May, P.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Shadron Kats (Shad) appeals the economic provisions of the decree dissolving his marriage to Melissa Kats (Missy). He challenges (1) the award of $3000.00 per month in spousal support to Missy, (2) the valuation of some of the property and the amount of the property equalization payment, and (3) the award of $50,000.00 in Missy's attorney fees and one-half of her expert witness fees. In this consolidated appeal, Shad also challenges a post-decree order that requires him to pay Missy $2000.00 per month in temporary spousal support while this appeal is pending. Finally, each party requests an award of their appellate attorney fees and costs.

### I. Background Facts and Proceedings.

The parties were married for twenty-eight years and have three children. Their youngest child, B.M.K., turned eighteen shortly before trial. Because of cognitive deficits, B.M.K. cannot read or write and needs help with everyday tasks like bathing and dressing. B.M.K. was attending high school at the time of trial and is expected to graduate this spring.

Several successful business ventures began during the marriage. The parties bought a gas station with a convenience store and repair shop, which Shad operated. They sold that business after ten years and used the proceeds to purchase farmland, and Shad began a farming operation. Hauling grain to storage elevators led to the start of two trucking companies. Shad worked as a driver and dispatcher, while Missy helped with bookwork.[1]

---

[1] Missy described her role as "a secretary." She testified that she can do payroll and quarterly reports but does not understand profits and losses.

Due to the success of their businesses, the parties acquired real estate and other property. On top of their homestead and four farms, Shad and Missy bought a second house and a cabin. At the time of the divorce, they also owned many vehicles, equipment for the farming and trucking operations, and some financial investments.

Missy petitioned to dissolve the marriage in September 2018. The matter went to trial two years later to determine the value of the parties' assets and how to divide them. The district court was also asked to decide the issues of spousal support and attorney fees.

The district court entered a decree dissolving the marriage in December 2020. The court assigned values to the contested assets and debts and attempted a roughly equal division of the property. To balance any remaining inequity, the court ordered Shad to pay Missy one-half of the difference in the value of the assets awarded in his favor.[2]

The court then turned to spousal support. Finding a significant difference in earning abilities, the court ordered Shad to pay Missy "reimbursement or transitional alimony in the amount of $3000.00 per month for a period of 48 months . . . until paid in full." The court then ordered Shad to pay Missy $3000.00 per

---

[2] Because of mathematical and typographical errors, the court modified the amount of the equalization payment in a post-decree order and again in an order nunc pro tunc. In the end, Missy received assets valued at $2,697,166.40 and debt valued at $946,415.86, a net value of $1,750,750.54. Shad received assets valued at $2,921,524.41 and the debt valued at $968,904.94, a net award of $1,952,619.57. Because the difference in net value of the awards was $201,869.03 in Shad's favor, the court ordered Shad to pay Missy one-half that amount: $100,934.52.

month in traditional alimony for the rest of her life or until she "remarries or cohabitates with someone other than a member of her immediate family."

Finally, the court addressed Missy's request for an award of her attorney and expert witness fees. The court found it clear that Shad was responsible for much of the attorney fees that Missy incurred, which "could have been avoided had he chosen to take appropriate steps to provide discovery, cooperate with valuation experts, and avoided obstructive behavior." Because of the disparity in the parties' earnings, the court ordered Shad to pay $50,000.00 of the $75,750.75 Missy incurred in attorney fees. The court also ordered Shad to pay one-half of Missy's expert witness fees.

Shad timely filed a notice of appeal from the dissolution decree. He filed a "motion for stay/supersedeas bond" two days later, asking to use some of the real estate he was awarded in the decree as collateral for a supersedeas bond. In the alternative, he asked the court to "establish separate supersedeas bond amounts for the various judgments set forth in the Court's decree and amendments thereto."

Missy resisted Shad's motion for a stay or supersedeas bond, arguing she needed spousal support to meet her needs. In the alternative, she asked for and separately moved the court to order temporary alimony while the appeal was pending. Missy stated she was no longer employed by the trucking company and had no means of paying for insurance or maintaining a household without the support payments.

After a hearing, the court denied Shad's motion for a stay except to grant him "a 30-day stay of the execution of any judgment to allow him to secure the supersedeas bond and post it with the Clerk." The court denied Shad's request to

use real estate to secure the supersedeas bond and set the total amount of the bond at $181,428.00. The court noted the amount of the bond was "adjusted to reflect the payment of temporary alimony during the pendency of the appeal as a deduction for the alimony portion of the judgment on appeal." The court also set out separate amounts of supersedeas bonds for the property equalization, spousal support, and attorney fee award as Shad requested to permit him "to select which monetary judgments he wishes to stay." Finally, the court ordered Shad to pay Missy $2000.00 per month in spousal support while the appeal was pending. In response to a motion filed by Shad, the court clarified that the amount of temporary alimony would be offset against the award of permanent alimony.

Shad filed his notice of appeal from the court's order on the stay/supersedeas bond and temporary alimony pending completion of the appeal. He then moved the Iowa Supreme Court to consolidate the appeals. After granting the motion, it transferred the consolidated appeal to this court.

### II. Appeal of the Decree.

We first consider Shad's appeal of the economic provisions of the dissolution decree. He challenges the award of spousal support, the amount of the equalization payment, and the award of Missy's trial attorney fees.

Generally, we review dissolution proceedings de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). This means that we give weight to the district court's fact findings, even though they are not binding. *See Mauer*, 874 N.W.2d at 106. We will disturb those findings only if they fail to do equity. *See id.*

**A. Spousal support**

Shad first challenges the award of $3000.00 per month in spousal support to Missy. He claims the district court erred in calculating the parties' respective earnings and Missy's financial need.

We begin by noting that spousal support is not a matter of right. *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). The district court has "considerable latitude" in fashioning or denying an award of spousal support based on the particular facts of each case. *Id.* (citation omitted). Because "the trial court [i]s in the best position to balance the parties' needs, . . . we should intervene on appeal only where there is a failure to do equity." *In re Marriage of Gust*, 858 N.W.2d 402, 416 (Iowa 2015).

Iowa Code section 598.21A(1) (2018) lists the relevant factors the court must consider in determining whether to award spousal support. *Mann*, 943 N.W.2d at 20. They include the length of the marriage, the parties' age and health, the property distribution, the earning capacity of the party seeking maintenance, and that party's ability to become self-supporting at a standard of living comparable to that enjoyed during the marriage. *See* Iowa Code § 598.21A(1).

In determining the award of spousal support, the district court noted the parties were married for twenty-eight years, are a similar age and health, have similar educations, and received roughly equal amounts in the property division. But it found "considerable earning capacity differences between the parties" that justified awarding Missy spousal support. The court found that Missy's work history was limited because her primary role during the marriage was caring for the children. And Missy's continuing responsibility as B.M.K.'s caretaker limits her

ability to work for now. The court found that Missy will likely become self-sufficient, but that her standard of living would be considerably diminished compared to what it was during the marriage. The district court also recognized that Missy's circumstances could change when she receives an inheritance from her mother and if B.M.K. moves out of her home. But "at this time, under these facts as they exist at the time of trial," the court found it equitable to award Missy $3000.00 per month in spousal support.

### 1. Missy's income

We begin by addressing Missy's income, which Shad calculates to total $96,549.22 per year. The record shows that Missy has three sources of income: her employment, payments from a trust, and rental income from the farmland the court awarded her. The parties disagree on the amount of income Missy receives from all three.

Shad first argues Missy's wages from employment should be calculated from the wages she earned at the time of trial. But those wages resulted from a temporary support order that provided Missy would receive an annual salary of $45,600.00 from one of the trucking companies instead of spousal support. Once the decree was entered, the temporary support order ended and so did that income.

Missy hired Craig Merry, a certified public accountant with forty years of experience, as an expert witness. Merry calculated Missy's wages based on her 2019 W-2, which shows she earned $6055.50 painting houses part-time at minimum wage. Missy planned to continue that work. Assuming that Missy worked full-time at this job, Merry calculated her annual wages to be $15,050.00.

A big factor impacting Missy's ability to earn wages is her role as B.M.K.'s caretaker. Because of an intellectual disability, B.M.K. functions at the level of a first grader and requires ongoing supervision. In recognition of the need to balance Missy's work for the trucking companies with her role as B.M.K.'s caretaker, the district court required Missy to work an average of only six hours per week to receive her wages. Nothing in the record supports a finding that Missy could keep earning $45,600.00 after the decree's entry. This is especially so because her role as B.M.K.'s caretaker curtails her availability to work outside the home.[3] Instead, the evidence shows the figure of $15,050.00 best represents Missy's current annual wages.

We next turn to the amount of trust income Missy receives. At the time of trial, Missy was receiving about $3500.00 per year in payments from a trust. That amount was expected to decrease to $1500.00 per year at some point. Shad calculates Missy's income using the $1500.00 figure while Merry used the $3500.00 figure. Because Missy was receiving $3500.00 annually from the trust at the time of dissolution, we include that amount in our calculation of her income.

There is a larger discrepancy in the parties' calculations for the amount of income Missy can earn from renting the farmland awarded to her in the decree. Matthew Kelderman, the accountant for the parties' trucking businesses, calculated the net rental income for the land awarded to Missy to be $49,449.22 based on the 2020 farm rental agreements. Merry calculated Missy's net rental

---

[3] Shad contests Missy's claim about the time she is needed to care for B.M.K., but we find the credible evidence supports Missy's account.

income to be $39,619.00 based on a scenario where Missy would sell some of the land awarded to her.

The record supports a determination that Missy would earn $49,449.22 in net rental income. Adding this figure to Missy's wages and trust income results in total income of $67,499.22 per year, the amount of income to which Missy stipulated.

### 2. Shad's income

Shad challenges the district court's finding that he earns a net monthly income of $11,569.50.[4] Merry calculated Shad's five-year average gross income from his Iowa tax returns for 2014 through 2018 to be $141,000.00. That the same period showed losses that averaged $45,267.00 for the parties' farmland. Merry testified a more accurate measure of earnings would be to use the farms' value by income, which is calculated by determining rental value and subtracting the cost of property taxes and insurance.[5] From that amount, Merry subtracted the cost of interest on the properties' mortgages to reach a net value of $53,485.00 per year. Adjusting Shad's income calculations by using the net value of the land instead of

---

[4] This figure stems from a child support guideline worksheet based on Merry's calculation that Shad earns a gross annual income of $252,717.00. That worksheet also assumes Shad is paying Missy $3000.00 per month in spousal support.

[5] The value-by-income figures for two farms were provided in their appraisals. Merry calculated the value by income for the third farm based on an estimated rental price of $250.00 per acre multiplied by the total amount of tillable farm acres listed in an insurance report and subtracting the cost of taxes and insurance. Adding the figures for all three farms, Merry calculated the total amount to be $107,520.00. Although this amount is less than what the land rented for in the 2020 agreements, the figure is used only to calculate the farms' net value by income to determine Shad's average income for the five-year period from 2014 to 2018. In calculating Missy's income, Merry used the same figures as Kelderman with an adjustment to reflect the sale of property.

the farm loss listed on the parties' tax returns would increase Shad's gross five-year average income to $252,717.00.

Merry explained that his calculation was supported by Kelderman's income analysis, which showed Shad's five-year average income to be $160,244.00. Kelderman also calculated an average farm loss of $41,197.00 and rental income of $10,921.00—a net loss of about $30,000.00. Kelderman also calculated the total net rental income from the farmland to be $77,143.00. Merry explained that replacing the $30,000.00 average loss with the $77,143.00 in rental income would increase the income calculation by about $107,000.00 for a total average income of $267,244.00—about $15,000.00 more than Merry's calculations. But Merry conceded that Kelderman's income calculations included income from both parties. Subtracting the income attributable to Missy from Kelderman's calculations would result in a five-year average gross income for Shad of about $227,000.00. The district court expressly found Merry's calculations about Shad's five-year average income credible.

Shad argues his income is more accurately calculated by using Kelderman's calculation of the parties' combined average five-year income ($160,244.00) and subtracting from it Missy's income. But Shad subtracts from that amount the total annual income Missy expects to receive post-decree from all income sources. A more accurate calculation would be to average Missy's earnings over the same five-year period ($33,864.20)[6] and subtract that amount from the combined five-year average income. Doing so shows Shad's average

---

[6] The parties' tax returns show Missy earned $14,799.00 in 2014; $36,909.00 in 2015; $39,376.00 in 2016; $37,974.00 in 2017; and $40,263.00 in 2018.

five-year gross income to be $126,380.00. But the average five-year income is calculated with farm losses, while Missy's post-decree income is calculated using the net rental income from the property the court awarded her in the decree. To balance this, we subtract the average farm losses of $41,197.00 from Shad's average income and add to it the net rental income from the property the court awarded him in the decree, which equals $27,693.78.[7] By doing so, we calculate Shad's total gross income to be $195,270.78.[8]

Shad complains that the district court failed to "factor in the declining revenue of the trucking companies and changes and adverse local market conditions." Merry testified that he did not factor in the parties' 2019 tax returns when calculating Shad's average five-year income because the losses shown for one of the trucking companies seemed "excessive." Because Merry could not account for how such a large loss would have occurred, he questioned its accuracy. He also noted that the 2019 tax return reported a $20,000.00 loss before deductions while Kelderman's report showed a $39,464.00 profit for the same year. Missy suggests that in response to her petitioning to dissolve the marriage, "Shad intentionally sabotaged his business income by not retaining drivers, by not aggressively seeking work and by not personally driving any truck for the past two

---

[7] This amount was determined by subtracting the net rental income from the property awarded to Missy from the total net rental income figure calculated by Kelderman using the 2020 agreements.

[8] Using different figures, Shad argues the alimony award is inequitable under the spousal support guidelines published in 2007 by the American Academy of Matrimonial Lawyers (AAML), which the Iowa Supreme Court discussed in *Gust*, 858 N.W.2d at 409, 416 n.2. But the supreme court recently stated that the AAML guidelines "can no longer serve as a 'reality check' for spousal support awards in Iowa" because they do not reflect changes to the federal tax code. *In re Marriage of Pazhoor*, 971 N.W.2d 530, 538 n.3 (Iowa 2022).

years, even though he was capable of doing so." She notes that despite Shad's claims of a depressed economy for the trucking industry, it is one of the few that was considered essential during the COVID-19 global pandemic.

When asked about the 2019 losses, Kelderman testified:

So AD Trucking primarily showed a loss, from my understanding, was fewer drivers during the year. They essentially didn't have all their trucks and trailers always moving so it created a little bit of extra overhead which contributed to that loss. Another contributing factor, from my knowledge, is the rates that truckers are getting paid are being reduced a little bit so that adds into it a little bit. And then they—you know, they both, Shad and Missy, take salaries out of AD Trucking, which when owners take salaries out it can drive down income a little bit, but their salaries have been fairly consistent, so primarily, from my understanding, it's not having all the trucks and trailers always moving due to fewer drivers or loss of drivers and then some rate issues with their primary customers.

Kelderman testified that "2019 was an interesting year" in which income—one-fifth of what it was in 2018—was "lower than [Kelderman] would have expected." In addition, Shad's decision to rent the farmland rather than farm it in 2020 left him unable to optimize the deductions he had taken for the past fifteen years to offset what was expected to be a very high self-employment tax.

The district court did not make any explicit findings about how the trucking businesses would operate in the future given Shad's claim of a downturn in profits. Instead, the court implicitly rejected the claim by finding

Shad is quite good at his business and is adaptable and innovative to such an extent that shifts, changes, and developments in his business will only prompt him to adapt in order to be successful. He has a proven track record of doing that successfully in the past and the Court sees no reason to expect otherwise.

Shad argues that "[a] finding of resourcefulness is not a legal substitute for a finding that a business will continue as it has despite adverse market conditions." In any

event, it is clear that the district court did not credit Shad's claims about his declining business. The expert witness testimony at trial supports this finding.

### 3. Missy's expenses

Finally, Shad claims Missy overstated her monthly expenses, which she estimated to be $7673.00. The district court agreed that Missy's budget estimate "is a bit overcompensated as to expenses" and "covers more than just Missy as to some of the expenses." Shad argues that Missy's budget "is likely closer to $6673 per month."

Even using the lower figure for Missy's monthly expenses, the district court's award of spousal support is justified. Missy's net monthly income is nearly $3000 less than this amount. Missy's net income relative to her monthly expenses supports the court's alimony award.

### B. Equalization payment

Shad next challenges the amount of the equalization payment the district court ordered him to make to Missy. Although he does not dispute the property division, Shad challenges some values the district court assigned to some of the property.

The bulk of the district court's ruling—nearly forty pages—addresses the valuation and division of contested assets. The court's final accounting valued the parties' assets at over $5,500,000.00 and their debts at almost $2,000,000.00. The decree provides Shad with a net award of $1,952,619.57 in assets, $201,869.03 more than the court awarded to Missy. To balance the award, the court ordered Shad to make an equalization payment to Missy in the amount of $100,934.52.

Shad first challenges the valuation of some of the parties' personal property. This property was appraised by Ty Quade, an auctioneer with more than thirty years of experience in appraising and selling antiques. Missy hired Quade, who spent around twenty-nine hours appraising the parties' property. The district court considered both Quade's testimony about how he researched and appraised the property, as well as Shad's challenges. It adopted the appraised value assigned by Quade for some property but disregarded it for others. Shad now complains that the district court overstated the value of the personal property awarded to him by $27,430.20.

Shad's argument hangs on the presumption that the district court adopted Quade's valuations of the personal property at issue and made mathematical errors in failing to deduct from those valuations the items of personal property it valued elsewhere in the decree. In the decree, the district court determines that

> the effort will have to be made by the Court to extract the items separately discussed and valued from Quade's appraisal in order to determine a remaining value of the items on the appraisal so as to value them and divide them in light of the requests of Missy and the Court's determination as to the equitable division of the personal property and equipment.

Whether the court intended to value the assets divided as Missy requested in the amount appraised by Quade is unclear. Even assuming this was the court's intent, we calculate the difference to be $12,804.00 rather than $27,430.00. Either way, we decline to disturb the valuation of the personal property at issue because it is within the permissible range of the evidence. *See In re Bare's Marriage*, 203 N.W.2d 551, 554 (Iowa 1973); *In re Marriage of Shanks*, 805 N.W.2d 175, 177 (Iowa Ct. App. 2011).

Shad also challenges the court's valuation of the equipment used by the parties' two trucking companies. To determine the property values of the trucking equipment, the district court adopted Missy's suggestion that Chad Hofer to appraise the semi-trucks and Shad's suggestion that Kirk Martin appraise the trailers. Using these experts' appraisals,[9] Missy valued DSL Trucking's equipment at $179,200.00 and AD Trucking's equipment at $325,900.00. Shad provided his own opinion about the values of the equipment. So did Robert Vander Bush, a ten-year employee of one of the trucking companies. Shad claims the value of DSL Trucking's equipment is $120,000.00 and the value of AD Trucking's equipment is $225,000.00.

The district court found the total value of the equipment to be closer to the expert appraisals adopted by Missy. It valued DSL Trucking's equipment at $177,000.00, slightly lower than Missy, and adopted the $325,900.00 value for AD Trucking's equipment. In doing so, the district court found the appraisals by a disinterested third party to be "reasonable and appropriate." Shad complains that the court overvalued the trucking equipment by $160,400.00.

On appeal, Shad complains that the district court determined he "had the expertise to value his assets and yet ignored that opinion when it came to the trucking assets." He argues Hofer's appraisals are inaccurate because they were done a year before trial and claims that the value of the equipment has dropped because of the COVID-19 pandemic. He asks us to reduce the total value of the trucking equipment awarded to him by $160,400.00.

---

[9] Hofer appraised each truck's value in a range that spanned about $3000 to $4000. Missy used the average or mid-range value for each truck.

We find no error in the district court's valuation of the trucking equipment. The source of the appraisal is relevant, as Quade explained when asked if he would agree that the value of a John Deere self-leveling loader owned by the parties was $11,000.00 based on an appraisal of a John Deere self-leveling loader by an unknown appraiser:

> Q. You would not agree that was the value? A. No. No. See, appraisals are somebody's professional opinion. Everybody has a motive. I don't know this guy from a bale of hay. It might be [for] a good friend working at John Deere [who] said, "I need an appraisal for $11,000." How am I going to accept that?

Shad is an interested party. As the recipient of the trucking equipment in the property division, he benefits from a lower valuation. The district court provided a reasonable explanation for its valuation of the equipment based on the experts' appraisals rather than on the testimony of Shad and his employee, and we defer to it. *See In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007) ("Although our review is de novo, we ordinarily defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence.").

To summarize, Shad contests the valuation of $187,830.00 of assets out of more than $5,500,000.00 assets in total, a discrepancy of about .034%. Because the district court's valuation of the property at issue is supported by the record, we decline Shad's invitation to adjust the amount of the property equalization payment by $93,915.10 and affirm.

### C. Trial attorney fees and costs

Shad also challenges the district court's award of $50,000.00 in Missy's trial attorney fees and one-half of the expert witness fees she incurred. An award of trial attorney fees depends on the parties' relative financial positions. *In re*

*Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We review an award of trial attorney fees for an abuse of discretion. *Id.* To overturn an award of attorney fees, a party must show the ruling "rests on grounds that are clearly unreasonable or untenable." *In re Marriage of Erpelding*, 917 N.W.2d 235, 238 (Iowa 2018) (citation omitted). "A ruling is clearly unreasonable or untenable when it is 'not supported by substantial evidence or when it is based on an erroneous application of law.'" *In re Marriage of Kimbro*, 826 N.W.2d 696, 698-99 (Iowa 2013) (citation omitted).

In determining an award of attorney fees, the district court noted that it had been assigned to the case from the beginning and was therefore familiar with the course of litigation. The court found it

> clear that a significant portion of the attorney fees incurred by Missy were due to choices and actions taken or not taken by Shad. Said another way Shad caused Missy to incur considerable attorney fees that could have been avoided had he chosen to take appropriate steps to provide discovery, cooperate with valuation experts, and avoided obstructive behavior.

The court also considered the parties' relative financial positions and found spousal support appropriate based on the parties' "different and disparate" incomes and the uncertainty of Missy's financial future. On this basis, it found it appropriate to award Missy $50,000.00 in her attorney fees.

Shad seeks to eliminate the award of trial attorney fees as a whole. He argues that the district court never awarded Missy any sanctions related to motions he filed in the case. He also notes some of Missy's unsuccessful positions on the property distribution, implying her conduct during the proceedings likewise increased the cost of litigation. He also complains that Missy failed to present

"evidence or itemized time entries of attorney fees detailing specific acts performed on specific days upon which the District Court could have calculated which fees could have been avoided."[10]  Finally, Shad argues Missy has not shown financial need given the substantial assets she was awarded and the district court's award of $10,000.00 in temporary attorney fees.

In the case of *In re Marriage of Winegard*, 278 N.W.2d 505, 512 (Iowa 1979), the Iowa Supreme Court found an award of $10,000.00 in trial attorney fees inadequate and increased it to $25,000.00.  The court found the increase necessary despite a $7500.00 award of temporary attorney fees and a $140,000.00 lump-sum property settlement.  *Winegard*, 278 N.W.2d at 512.  The court found that although "some of the expense of this case was occasioned by the untimely filing of certain documents and briefs by Sally's counsel, by far the majority of the time involved and costs incurred herein were caused by John's litigious nature."  *Id.*  Relying on *Winegard*, this court affirmed an award of $20,000.00 in trial attorney fees despite finding the recipient had the means to pay based on a property award of over $1,500,000.00.  *In re Marriage of Mugge*, No. 07–0079, 2008 WL 4525839, at *5 (Iowa Ct. App. Oct. 1, 2008).  We found the award justified based on the opposing party's conduct during the dissolution proceedings, which caused the recipient "to incur unnecessary amounts of

---

[10] Missy notes that Shad never objected to the attorney fee affidavit she submitted to the trial court, drawing doubt on whether Shad preserved error on this challenge. Even so, the court was qualified to decide how much of Missy should be compensated for incurring her attorney fees.  *See In re Marriage of Willcoxson*, 250 N.W.2d 425, 427 (Iowa 1977) (noting that "[t]rial courts are familiar with the value of services in dissolution matters" as "[m]ost of the services for which compensation was allowed were rendered during trial before the judge who made the award").

attorney fees." *Id.*; *cf. In re Marriage of Duffy*, No. 16-1466, 2017 WL 2684352, at 5 (Iowa Ct. App. June 21, 2017) (declining to increase award of trial attorney fees based on *Mugge* because "no such nefarious activity exists in the record"). Following the same reasoning, we find the district court acted within its discretion in awarding Missy $50,000.00 in trial attorney fees. *See also generally* 41 Am. Jur. 2d Husband and Wife § 162, Westlaw (database updated Feb. 2022) ("A spouse may be awarded legal fees without a showing of need where the court determines they were caused by the malicious conduct, bad faith, or delay tactics of the other spouse during the course of a matrimonial action."); 27B C.J.S. Divorce § 579, Westlaw (database updated Feb. 2022) ("All relevant factors should be considered in determining the amount of counsel fees and expenses to be paid by the charged spouse in a divorce action, *including circumstances which may tend to lessen or increase the expense of litigation*." (emphasis added) (footnote omitted)).

We turn then to the district court's award of one-half of the expert witness fees Missy incurred for Merry and Quade. In granting Missy's request, the district court found Merry and Quade presented evidence that was "necessary in order for the Court to do its job in valuing and dividing assets and determining incomes of the parties" so that "[i]t is as if they were serving as court experts." Shad tries to undermine this finding by highlighting perceived inadequacies in Quade's appraisals and Merry's income analysis, but we find no merit to his claim and decline to disturb the award of one-half of their fees.

### *III. Appeal of the Post-Decree Order for Temporary Spousal Support.*

In the second of these consolidated appeals, Shad challenges the post-decree order requiring him to pay $2000.00 per month in temporary spousal support to Missy while his appeal of the decree was pending. He argues his notice of appeal deprived the court of jurisdiction over the issues from which the appeal was taken.

As a general rule, the district court loses jurisdiction over a matter once an appeal is perfected. *See In re Marriage of McCurnin*, 681 N.W.2d 322, 332 (Iowa 2004). But there is an exception for collateral matters, over which the district court retains jurisdiction. *See id.* The question is whether an order for temporary support pending the outcome of an appeal is a collateral matter over which the district court retains jurisdiction.

There are few Iowa cases addressing the district court's ability to enter temporary orders for support while an appeal is pending. In support of his claim, Shad cites *In re Marriage of Spiegel*, 553 N.W.2d 309, 321 (Iowa 1996), in which the Iowa Supreme Court considered "whether and under what circumstances [it] has jurisdiction to award temporary alimony pending appeal." In answering the question, the court noted that the Iowa Code gives only the district court the express authority to enter orders for temporary support. *Spiegel*, 553 N.W.2d at 321. But it concluded that it had the power to order temporary spousal support during an appeal under its "inherent authority to grant such applications as an exercise of our constitutional mandate to 'issue all writs and process necessary to secure justice to parties.'" *Id.* (citation omitted). It then noted that

the present rule in this state and generally seems to be that after appeal in a divorce or separate maintenance case the trial court has no further jurisdiction over the controversy until some part thereof is remanded for further action. *Accordingly, any further allowances to the wife during pendency of the appeal cannot be made by the trial court but must be made by us.*

*Id.* (quoting *Scheffers v. Scheffers*, 44 N.W.2d 676, 681 (Iowa 1950) (emphasis added)).

In granting an order for temporary support, the district court relied on the supreme court's decision in *McCurnin*, 681 N.W.2d at 332, which was decided after *Spiegel*. But *McCurnin* involved an interim increase in child support during an appeal of an order modifying alimony. 681 N.W.2d at 324. The supreme court held the district court had jurisdiction to do so because it involved a collateral matter and cited *Spiegel* for the proposition that "a party should have the benefit of a supersedeas bond *unless the party seeking temporary support shows a need for the support.*" *Id.* at 332 (emphasis added). Because the appellee "proved to the satisfaction of the district court a need for the increased support to pay family expenses," the supreme court affirmed the interim order. *Id.*

Of the cases cited, we find the *Spiegel* holding is the more relevant to this appeal. After Shad appealed the alimony award, the district court had no further jurisdiction over it until remanded. See *Spiegel*, 553 N.W.2d at 321. And once Shad filed a supersedeas bond, the district court could no longer enforce the alimony provision while the matter was on appeal. *See id.* Interim support is available when an appeal is pending only if a party makes an application to the supreme court showing a need for it. The supreme court may address the merits of the application or remand the matter to the district court to rule on it. Because

the supreme court did not remand the issue of interim support to the district court, it was without jurisdiction to enter the interim support order. But in light of our decision regarding the spousal support awarded in the decree, the court's interim order has no effect on this matter. The decree requires Shad to pay Missy $3000 per month of spousal support beginning January 1, 2021. Any amount of unpaid spousal support that accrued while the execution of judgment was stayed on supersedeas bond is now owed to Missy.[11]

### IV. Appellate Attorney Fees.

Finally, both parties request an award of their appellate attorney fees. Such an award is not a matter of right but rests in our discretion. *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). In exercising this discretion, we consider the needs of the party seeking appellate attorney fees, the other party's ability to pay, and the merits of the claims made on appeal. *See id.* Considering these factors, we award Missy $19,483.75 in appellate attorney fees and $536.00 in expenses, a total award of $20,119.75.

### V. Conclusion.

We affirm the award of the provisions of the parties' dissolution decree regarding spousal support, an equalization payment, trial attorney fees, and expert witness fees. Because the district court lacked jurisdiction to enter an interim order

---

[11] Although we are of the opinion that the district court was without jurisdiction to enter the temporary order, it is of no consequence in light of our resolution of Shad's appeal of the decree and, therefore, there is no reason to reverse it. *See Sawyer v. Termohlen*, 122 N.W. 924, 926 (Iowa 1909) (affirming in spite of trial court's error in refusing to sustain a temporary writ of injunction because reversal would be of no benefit to appellant).

for spousal support while this appeal was pending, we vacate that order. And we award Missy $20,119.75 in appellate attorney fees and expenses.

**DECREE AFFIRMED; INTERIM SUPPORT ORDER VACATED.**